IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| THOMAS DAVIS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. G-13-242 |
| | § | |
| DYNAMIC OFFSHORE RESOURCES, | § | |
| LLC., et al. | § | |

## REPORT AND RECOMMENDATION

Before the Court, by referral from the Honorable Gregg Costa, United States Circuit Judge (Sitting by Designation), is the "Motion for Summary Judgment" of Defendant, Dynamic Offshore Resources, LLC (Dynamic); the Motion seeks the dismissal of all claims asserted against Dynamic by Plaintiff, Thomas Davis. The Motion has been fully briefed and is ripe. Now, after consideration of the Parties' submissions and applicable law the Court issues this Report and Recommendation.

## RELEVANT FACTS

At the time of the incident giving rise to this litigation, Davis, was an employee of Gulf Crane Services (GCS) who performed crane repairs on offshore platforms owned by Dynamic and located in the West Delta Field on the Outer Continental Shelf off the coast of Louisiana. On March 26, 2013, Davis reported for his work shift and was flown by helicopter to Platform 79C. He was then transported by boat toward Platform 86A where he believed he would stay until the next day when the strong windy conditions that persisted that day calmed down. However, unknown to Davis, Dynamic's Field Foreman, Tony

Racca, had scheduled the repair of the crane winch on Platform 86B. When the boat reached 86A, Davis observed materials being loaded on the boat that he concluded were destined for the winch repairs on 86B, an unmanned platform. Davis quickly realized that the windy conditions made the intended repairs too dangerous to perform on the unmanned platform and decided to contact Racca and exercise his contractual stop-work authority. To do so, Davis opted to use the telephone on 86A rather than contact Racca over the radio aboard the boat because he thought a phone call would be more private and professional. To make the call, Davis requested he be lifted to the deck in a personnel basket by the 86A crane. No Dynamic foreman was present on 86A that day, therefore, pursuant to Dynamic's "Safety and Environmental System Program" the rig supervisor, an employee of Wood Group PSN (Wood Group), had the final responsibility for decisions addressing personnel safety. The deck of the platform was about 50 feet above the surface of the water, but Davis believed, and still believes, the lift could be safely performed despite the wind.

The crane operator, an employee of Shamrock Management (Shamrock), lowered the basket to the deck of the boat and Davis climbed in for the transfer. As soon as the basket cleared the boat deck the crane operator improperly swung the boom into the wind during the hoist. The wind resistance caused the cable to spool incorrectly and it began to bunch up on one side of the winch drum. About half way to the deck of 86A, the basket suddenly dropped about 6 to 8 feet, then snapped to a stop, and began bouncing on the cable. Davis immediately began feeling pain in his shoulder, back and knees. The pain was a result of

2

severe injuries sustained in the fall. Following the incident, the crane was found to be in good working condition.

On June 28, 2013, Davis filed suit against Dynamic. Shamrock and Wood Group PSN are also Defendants. Dynamic has now moved for summary judgment as to all claims asserted against it by Davis.

## ANALYSIS

Dynamic argues that it is entitled to summary judgment for the simple reason that pursuant to contracts Gulf Crane, Wood Group and Shamrock were all independent contractors free to perform their work, or not, as they saw fit and, consequently, it is they, not Dynamic, that could have potential liability for Davis' injuries. Davis, in an effort to salvage some litigable claim against Dynamic offers several time-worn or factually deficient theories that the Court, in turn, will quickly dispatch.

First, Dynamic. Dynamic had a separate master service agreement (MSA) with Gulf Crane, Wood Group and Shamrock. Each MSA contained an identical provision which designated those companies and their employees as independent contractors beyond the control and direction of Dynamic. Each company was also bound by the terms of a Bridging Agreement to comply with Dynamic's Safety and Environmental System Program. The Bridging Agreement included a "Stop Work Authority" section making any independent contractor free to elect not to perform work that presented an unreasonable risk of injury and

3

an "Ultimate Work Authority" section which designated final decision making power on each platform to the "lead operator" if a Dynamic foreman was not present.

Now, Davis. Davis argues that Dynamic did not have an MSA with Wood Group at the time of the incident and Dynamic is, therefore, responsible for allowing the overly risky basket transfer to its platform to take place. However, Dynamic has submitted summary judgment evidence establishing that on December 31, 2012, about three months prior to the incident, a merger and name change bound Wood Group to the MSA as a successor to Production Services Network, the original signatory to the MSA. Hence, Wood Group's employees were independent contractors and its supervisor was the person with ultimate decision making authority on 86A on the day Davis was injured in the transfer.

Davis also argues that Dynamic exercised too much control over the work to be shielded by the independent contractor clause of the MSA. Specifically, Davis cites the independent contractor clause as giving Dynamic the "general right to inspect the work" and "reasonable access to the work"; and cites the MSA and Bridging Agreements as compelling the alleged independent contractors to comply with Dynamic's safety rules and regulations. First, under Louisiana law, independent contractor status is "in large measure determined by the terms of the contract itself." Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 193 (5th Cir. 1991) Second, the degree of control Davis cites has long been held insufficient to void independent contractor status under Louisiana law. Cf. Grammar v. Patterson Services, Inc., 860 F.2d 639, 644 (5th Cir. 1988) ("We have consistently held that

operational control does not arise unless the principal retains control over the methods and manner of performing the work.")

Dynamic reads Davis' response as alleging that the independent contractor clause provides that, pursuant to the Louisiana Workers' Compensation Statute, Dynamic was his statutory employer. The Court does not believe Davis has raised this issue, but insofar as he may have, it is without merit. The Louisiana law simply cannot apply to this case which involves an accident on the Outer Continental Shelf where the Longshore and Harbors Workers' Compensation Act controls. Gates v. Shell Oil, 812 F.2d 1509, 1513-14 (5th Cir. 1987)

Davis contends that Dynamic is vicariously liable for the negligence of Wood Group and Shamrock employees under the "borrowed servant" doctrine. Despite the fact that under this argument Davis himself would be Dynamic's employee and limited to workers' compensation benefits, in the absence of contrary contractual language or the retention of operational control over a contractor's work, the borrowed servant doctrine will not apply. In this case, the contractual language and the absence of "operational" control over the methods or manner of the work preclude any finding that Wood Group or Shamrock employees were the "borrowed" employees of Dynamic. Carter v. Amfels, Inc., 2000 WL 359863 at *2 (Ed. La. 2000)  The mere fact that Dynamic's field foreman possessed oversight responsibility for all 22 of the platforms in the West Delta field will not suffice. And Davis' reliance on Morgan v. ADC Manufacturing, 710 So.2d 1077 (La. 1998) is

misplaced: neither Wood Group nor Shamrock are disavowing responsibility for their involved employees.

Davis further argues that Dynamic exercised operational control because, despite the windy conditions, Racca "ordered" that the winch repair on 86B be done on the day of Davis' accident. According to Davis, that "order" began the chain of events leading up to his accident and but for that order the accident at 86A would never have occurred. Obviously, there are several flaws in this argument. The fundamental flaw is that Racca did not "order" the repair to be done: the communication Racca wanted passed on to Davis was that because a boat was in the field that day and Davis did not have "a lot going on" that Davis be "asked" to go repair the crane "*if he could*." (emphasis added)   In addition, Davis had stop work authority and by the time of his accident he had already decided to exercise that authority and refuse to do the work on the unmanned 86B because of the wind. The exercise of that authority could have been accomplished by remaining on the boat and informing Racca, via the boat's radio, that he had elected not to do the work. Furthermore, Davis himself testified that a personnel basket transfer that day would have been a safe procedure, despite the wind, if done properly, which the Court presumes, is  why he requested the transfer to the platform so he could use the phone instead of using the radio. This final point all but prohibits his argument that the basket transfer was, because of the wind, an ultra hazardous activity barring Dynamic's reliance on the independent contractor clause. While the Court will not go so far as to say that, as a matter of law, weather

6

conditions could never render a basket transfer an ultra hazardous activity, this is certainly not such a case.  Cf. Mathis v. Lafayette Crew Boats Services, Inc., 1995 WL 550950 *2 (Ed. La. 1995) (Personnel basket transfer in rough seas not ultra hazardous as a matter of law because the risks of harm can be avoided with the exercise of due care.) But see, Callahan v. Gulf Logistics, 2011 WL 6846269 (C.A. 5) (La.)) (Conflicting testimony concerning the conditions of the sea and the impact of those conditions on the reasonableness of a decision to undertake a personnel basket transfer found to preclude summary judgment.)

For all of the foregoing reasons, it is the **RECOMMENDATION** of this Court that the "Motion for Summary Judgment" (Instrument no. 46) of Defendant, Dynamic Offshore Resources, LLC, be **GRANTED**, and that all claims asserted against Dynamic by Plaintiff, Thomas Davis, be **DISMISSED**.

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who **SHALL** have until **Monday, December 29, 2014**, to have written objections, filed pursuant to 28 U.S.C. §636(b)(1)(C), in the Office of the Clerk.  The Objections **SHALL** be electronically filed and/or mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553.  Failure to file written objections within the prescribed time **SHALL** bar any Party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this \_\_\_\_\_15th\_\_\_\_\_ day of December, 2014.

_____
John R. Froeschner
United States Magistrate Judge